324-0093, Northern Illinois Gas Co. doing business as NICOR Gas Co. Appellant v. Illinois Commerce Comm'n et al. Appellee. Mr. Berlow, if you're ready to proceed. I am, Your Honor, and thank you, Your Honors, and may it please the Court. Clifford Berlow on behalf of the Northern Illinois Gas Co., NICOR Gas. Your Honors, we've identified three different objections we have to the order the Commission reached in this case, those being the implementation of a long-term infrastructure planning requirement, the refusal to use our actual capital structure as part of the computation of rates, and then the disallowance of certain capital additions. And that issue boils down into sort of three sub-issues, transmission plant, distribution plant, and MAOP costs. Certainly want to address the issues that are of greatest interest, greatest concern to the Court, but at least at the outset, it seems to me that the appropriate place to start is the Fifth District Appellate Court's recent ruling, which we've submitted as supplemental authority here in this Court. Because that Court reached two rulings on issues of law that we believe are significant here and are on point with arguments we've made to Your Honors. The first is that the long-term infrastructure plan requirement violates the Illinois Administrative Procedure Act, and it does so for the same reason we articulated in our brief. This is a rule within the meaning of the APA. It was issued without notice and comment rulemaking, and it was also done without statutory authority. Either of those two grounds would be sufficient to invalidate the plan. The second relates to the disallowance of MAOP costs. And here, what the Fifth District held is that the commission was improperly retroactively redefining the standard for the burden of proof that a utility has to meet and then applying it to this case rather than only prospectively. And this may warrant just a little bit of elaboration, if I may. Historically, ever since the MAOP rule came into effect, it was first proposed in 2019, it went into effect in 2020, the Commerce Commission had accepted the plan as approved by the federal regulators as sufficient to demonstrate the reasonableness of the MAOP expenditures and had expressly rejected the Attorney General's argument that there needed to be a third project breakdown of each individual MAOP project and go through what it is that the various remediation methods and reconfirmation methods and justify one at a time through that portfolio what it was that the utility intended to do. In these two cases, both Ameren and our case, for the first time, the commission said, no, we want a per project portfolio to be put forward. And what the Fifth District held was that this could absolutely, I don't know if they'd say this expressly, but I don't think anyone disputes, you could do this prospectively. There is no doubt that if the commission had wanted to convene a rulemaking and have this be the standard going forward requiring this submission, you could do that. But what you can't do, what in the words of the Fifth District was disingenuous, which is, I think, a pretty stark language to use about an Illinois administrative agency, was to take that new standard, having previously disavowed it, and saying, you lose the case that's in front of us after the evidence is closed, after the record has been completed, because you didn't meet this new, elevated, higher standard that had never before been announced. That smacks at fundamental principles of procedural due process. It's almost certainly in violation of the Administrative Procedure Act. And so, for that reason, the MAOP ruling simply cannot stand. Now, there's also a substantial evidence component on the MAOP disallowances that I want to address briefly, because we're on all fours with that, we believe, as well. Briefly, your honors, in both the Ameren case and in the NICOR case, the commission said that there had not been any per project information put forward about any of the MAOP reconfirmation work. What the Fifth District said was that that's just not true, that there's something called a Schedule F-4, we have a Schedule F-4 as well, we cite it in our brief, that provides almost all the information that the commission said was lacking. And on that F-4, which lists the 10 or so most expensive projects for the upcoming year, some of those projects were, in fact, MAOP projects. The same thing is true of us. We have a Schedule F-4. It identifies MAOP projects, specifically the Dubuque line, the Bensonville line, the Crawford line. And that submission, along with the work paper supporting our Schedule F-4, provides a lot of the information the commission said wasn't there. And so, for that reason, the MAOP disallowance failed as a matter of substantial evidence as well. So, we think on either basis, you can agree with the Fifth District. Obviously, the legal ruling, in many respects, is the more egregious of the two. But one way or the other, we think the Fifth District's decision here should be instructive to the court. We would urge the court not to create a split of authority on those issues. And unless you have specific questions about either of those issues, sort of my instinct would then be to focus on the issues that this case presents that are genuinely unique here and where you don't have the benefit of the Fifth District having engaged in a detailed analysis of the same or similar issues. Is that the extent of the Fifth District case that you think should be instructive for us? Well, Your Honor, I would be remiss, I would say, if I didn't note here that Ameren, like us, appealed the disallowance of certain distribution plant costs. And that on that issue, the Fifth District affirmed the disallowances. Now, we think for the reasons we've – that's really an evidentiary issue. It's a case-specific, fact-specific issue. And we think for the reasons we've articulated in our briefs, and we certainly stand by those arguments, that our record may be slightly different than what was before the court in Ameren. Certainly, though, I can't say that Your Honor would be incorrect to take note of the Fifth District on that point. We think that, frankly, the Fifth District should have and could have gone farther and should have said that also those disallowances should not have been affirmed either. But, again, I think that's ultimately a record issue. It comes down to the specific facts of the case. And I think our record may be slightly different than what was at issue in Ameren. Thank you. The rule regarding capital structure is that the commission is obligated – and this comes from this court's decision in Hartigan from 1991, and it was reaffirmed and has not been questioned by the commission – that the commission is obligated to use our actual capital structure unless affirmative evidence is put into the record proving that our capital structure is unreasonable, imprudent, or unfairly burdensome. So it's the inverse of what you see with respect to the capital additions and also what this court dealt with, Justice Hedl, obviously, in the QIP issue. This is the exact opposite. The burden really is on the objectors to come forward with affirmative evidence of unreasonableness rather than our burden to come through and prove reasonableness. And I think here the problem that we find is at two levels. One is a factual level and one is a legal level. Let me start with the legal level if I may. What the commission held here is that our capital structure was shown to be unreasonable because we have more equity than is necessary. And I would imagine you, like me, it just begs the question, necessary to do what? Well, I think we can rule out a few different things right away. At one point in the commission's brief, they say any more equity than is necessary to provide service, that goes too far. And of course, that can't be the rule. Utilities provide service when they're well into the depths and mired in bankruptcy. It can't be the case that you have to be actually in collapse with the inside of a federal bankruptcy court before you've acted in a reasonable way. Another is at one point in the commission's decision, they say you can't have more equity than necessary to ensure financial integrity. And financial integrity really is a euphemistic term for insolvency. And so, again, it can't be the case that we have to come up and teeter on the nice edge of federal bankruptcy before we act in a reasonable way. And the other possibility that seems to be out there is that the commission believes it can just set a cap on its own without regard to any case specific evidence and say you can't have more equity than what we arbitrarily decide. And of course, that's going to run headlong into the statute, which has to be which says this has to be grounded in specific facts, in specific evidence that there's a burden of proof about showing unreasonableness. It can't be that you can just set a cap. Now, to be clear, there is something like a cap in the electorate context. The rule is that you essentially have a presumption of reasonableness up to 50 percent, but that if you want to go above 50 percent, then the burden shifts and the utility needs to come forward with affirmative evidence showing that it would be reasonable or necessary to go higher. But as the fifth district really pointed out with regard to the long term planning requirement, you can't export rules that apply only to the electorate context and put them over into the natural gas context simply because you feel like it. That requires an act of the General Assembly. The General Assembly hasn't acted here. So that really only leaves the possibility that we outline in our brief and that the commission seems to take real umbrage at, although they never disavow that that's the rule they're saying, which is that you can't have more equity than is necessary to stave off a credit downgrade. Again, you have to come up to the water's edge of a credit downgrade before it is that you have acted in a reasonable way. My submission to the court is that's not the test. The test is the one this court set forward. What the commission is tasked with asking is not whether you come up to the water's edge. It's whether or not you have been shown affirmatively to have acted unreasonably or imprudently. And the reality here is that there is there any number of reasons why the credit downgrade line can't be, as we explain in our reply brief in particular, but also our opening brief. That is not a knowable number in advance. You can't know exactly where that line is prior to the upcoming year because it's dependent on dynamic conditions in the market. And if we could all predict exactly what the market was going to do, I think many of us would be retired. So the reality here is that it can't be the rule because it's not functional. The other problem is that we have a long track record of having shown the importance of having some play in the joints here, not coming up to the water's edge. Look at what we discuss in our brief about winter storm URI. Look at what we discuss in our brief about the 2023 banking crisis when Silicon Valley Bank met its demise. Look at what we show in the brief about COVID-19. In every case, because we had sufficient wiggle room with respect to our credit rating, we were able to access the credit markets and crucially, we were able to continue to access natural gas to serve consumers in Illinois. So the standard really can't be no more than necessary to avoid a credit downgrade because there's a long track record about this not being a workable standard and also being a dangerous standard for the public. Now, what did – this kind of gets to the substantial evidence component of this. What did the record actually show? The record showed three things. There was testimony from staff saying that NICOR could have maintained its existing credit rating if it had only 50 percent equity, but there's an important caveat here. The caveat is that that assumed there would be no capital disallowances and that there would not be a reduction in a return on equity, and of course, the commission elsewhere in its decision did both of those things. It dropped return on equity from 9.89 percent to 9.51 percent, and it disallowed, as your honors are well aware, several hundred – over $100 million of capital additions. So there's no evidence that 50 percent works given the other things that were going on in this decision. The second was an averaging study that took place saying that the average utility in the United States was at 52 percent equity. The commission can't simply stand by the argument that – simply can't show that we act unreasonably by not being 200 basis points below the national average. If anything, I think the 52 percent shows is that the commission went too far here. And the last point here – and I'm mindful that my time is running short, but I want to address the finding about the idea that our relationship with our parent company, Southern, is the reason that the equity ratio is high. And I will submit to your honors that that is also not supported by substantial evidence. Why? It's because the standard is you can't have an equity ratio that's high because of the relationship, causation. There is no evidence of causation in the record. Indeed, as we point out at page nine of our opening brief, our capital structure had been at 54 percent or as high as 58 percent well before the merger took place that brought in Southern into the relationship. If we have been at one level for a long time prior to this relationship existing, you cannot say that the relationship is the reason that this was elevated. So all that's in the record on this point is a staff member's testimony that there is this corporate relationship on the one hand and on the other hand that there is an economic incentive. It cannot be the case that merely having that relationship and the incentive is sufficient proof to demonstrate causation. If it were, every utility that has a parent would automatically be too high in the words of the commission simply because it has a parent. Mr. Verlo, thank you. Your time has run at this point in time. Justices, do you have questions? I do not. I do not. All right. Mr. Dodds. I just want to make sure my audio is good afternoon. Your honors. My name is Brian Dodds. I'm special assistant attorney general appearing on behalf of the Illinois Commerce Commission in this matter. I just want to take a step back and give a little bit of context for what the commission was grappling with in reviewing this 9201 petition for a rate increase. This was as of the filing on January 3rd, 2020, NICOR's fourth petition for a rate increase in five years. They were seeking to add $321 million into a rate base, and AG witness David Dismukes testified that this would result, in addition to the 32 million in riders, in a 30% increase in the average customer's utility bill if that went into effect. When combined with roughly a decade of qualified infrastructure plant addition recovery to the tune of hundreds of millions of dollars, it's fair to say that the utility was not facing lean times when it filed this case. I want to address the capital structure and long term infrastructure planning primarily. If your honors have questions about the disallowances, I'd be happy to address them, but turning directly to the capital structure issue first. So what NICOR came in here with was a proposal for 54.52% equity and the remaining 45.5% debt. The testimony in case law is very clear and unanimous here that utilities can raise capital by either issuing equity or taking on debt. They don't want to take on excessive debt for the same reason you and I don't want to take on excessive debt, but they can't take on excessive equity because it is generally agreed in financial theory that equity is more expensive than debt. And so 9201 has a duty that rates flowing onto customers have to be just and reasonable, and that expenses that are going to be moved into rate base have to be prudent. So what the commission is trying to do is balance the competing interests of investors and rate payers. Staff witness Sheena Kite-Garlish examined that 54.52% equity portion and noted that compared to her sample group analysis and even compared to NICOR's own witness, Dr. Veladze's sample group, that equity portion was high. It was several percentage points higher. She looked then at Standard & Poor's global IQ resource and compared to other comparable gas distribution utilities and found that this equity portion was inflated. So what is going on here? And she, rather than, as counsel represents positing a cursory explanation of the leverage investing going on, she spent 12 pages in rebuttal testimony or in her direct testimony and followed up in rebuttal. I invite the court to look at Exhibit Volume 8, 6822-34. There she explained that during the period of its ownership, 2016 to the present, Southern Company's equity portion was 37%, significantly lower than NICOR's. What she posited when she compared these sample groups and the parent companies was that Southern was effectively loading up on debt and using its wholly owned subsidiary NICOR regulated utility to service that debt. The problem is Section 9230 of the Public Utilities Act expressly violates that. An Illinois case law has affirmed that reading of the statute. In particular, this court's decision in Camelot said that when the ICC balances investor and public interest, if the rightful expectations of the investors are not compatible with that of the public, it is the public that must prevail. So, too, an Illinois bill cited by both parties in this case, it said that under 9230, if the risk imposed upon the utility flows to customers and increased capital costs by one iota, if they pay $1 more and that flows under rate payer's shoulders in their utility bill, that is a violation of 9230. That is what the commission explicitly held here in page 106 and 107 of its order. And contrary to council's representations, the commission made an explicit finding that the equity portion was inflated. It said, and I'm looking at the second to last paragraph on page 106 of our order, an imputed capital structure is not an actual capital structure and in adopting staff's imputed capital structure, we have to find that it is reasonable to disregard the utility's proposal. And they did that. Why? Because the equity portion was inflated and as Ms. Kight-Garlish's testimony showed that they credited and explicitly cited at the top of 107, NICOR's equity ratio is much higher than that of its riskier parent company. And it appears to be inflated due to that relationship. That is a 9230 violation. There's substantial evidence supporting that. We urge the court to affirm. Council quibbles with the term optimal as if we're articulating a new standard, but the word optimal is really only an articulation of Camelot and Illinois Bell. When it says not one iota higher, not one, that means no higher than necessary to ensure the financial integrity. Nobody is insisting that this company sit on the ninth edge of bankruptcy, but nor can it gouge Illinois rate payers to service an unregulated parent company. And we encourage the court to affirm on that basis. Now, unless you have any questions, I'll turn to the long-term gas infrastructure plan issue. I just want to make three points very clear. Section 4101 of the Public Utilities Act places the burden on the commission to generally supervise utilities and inquire into their management. Section 5101 puts a burden on regulated entities to furnish necessary information, quote, whenever required. Based on those pre-existing authorities, the commission tried in this case to get a sense of what type of long-term gas infrastructure planning NICOR was engaged here. And the reason we know that, I invite your honors to look in the record. This is at Common Law Volume 6, page 8085 to 8088. The commission posed direct questions to the utility, in particular question 4 of the commissioner questions. In April of 2023, this was just a few months into the case. What is your long-term planning with respect to increased electrification policies, both in the federal and the state level? The answers that we got back, and that's the site I just gave you, 8085 is NICOR's answers, were cursory. They did not engage substantively with the question in order for us to engage in our prudence review. And the commission noted that. In page 230 of its orders, it called those answers disappointing. And on the very next page, we have the section directing them to submit a long-term gas infrastructure plan. This is all an extension. This is a rising out of a lack of evidence in the record. But a suggestion on one hand and an order on the other, they're two different things, aren't they? They are, absolutely. But it is in order for the commission to satisfy its mandate to determine prudent long-term investments. That's what section 9211 requires of us. That's what they were trying to do by eliciting this. And the regulated entity has a burden to supply it. Now, in the reply brief — You disagree with the 5th District's decision in Ameren, then? I'm sorry, what was the — You disagree with the 5th District's decision in Ameren on this point? We do. And with all due respect to the 5th District, they simply misapplied the standards and got some of the case law wrong. Specifically, they cite to the Harrisonville decision, which NYCORP does as well and urges this court to treat that as dispositive. But it's not on all fours. There, a telecommunications company was coming in for certification and access to easements and sought either a variance or a finding that it complied with the requirements. Where the commission erred, and this is important, where the commission erred was it issued a declaration that you can have your variance, but in the future you have to comply with X, Y, and Z. The commission, outside of its Part 200 rules and very narrow circumstances, does not have circuit court authority to issue declaratory judgments. We can't issue a declaration binding in the future articulating law. We have to deal with the facts in this case right here, in a contested case. That was the error in Harrisonville. Harrisonville did not address 4101, 5101 of the Public Utilities Act, and necessary information for the commission to assess prudent and reasonable costs. That's what's at issue here as opposed to a declaration of you must comply with this part of the statute or seek a variance. Harrisonville is inapposite to this case. And frankly, the reason we know that this is not a rulemaking is two reasons. First, there are utilities in Illinois, gas distribution utilities, that were not affected at all by the long-term gas infrastructure planning. We have MidAmerican Energy, Mount Carmel Public Utilities, Consumers Gas Liberty. There are other utilities outside of the four where the commission did impose a long-term infrastructure planning requirement. And second, it isn't, so for that reason, it isn't a statement of general applicability in the policy because it's addressed to different utilities and not others. The reason that it was issued… Doesn't that raise other problems? I'm sorry? Doesn't that raise other problems that you're telling certain ones that they have to do this and others they don't? They were telling these four utilities to do this because in the course of the rate cases that they filed… I understand that. Yeah, there was a lack of evidence throughout all of them. We posed these questions to them, to North Shore and Peoples in the 0068 and 069 case, to NICOR and to Ameren. What is your policy with respect to electrification? We need to know, are you going to have stranded assets in the ground considering you've just spent hundreds of millions of dollars in QIP on these infrastructure upgrades? What are your plans? This is part of our prudence inquiry. The utilities almost uniformly refused to engage, and so we directed them in an order to supply a report to us every two years. And I'll just note, there were other instances where we ordered a compliance filing. I'll just direct the court's attention to page 39 and 55 in the order. We directed them to file an MAOP compliance plan every year. They have agreed to and, in fact, already filed their first one and agreed with staff to file it on an annual basis. We directed them to supply gas leak reporting at page 55 in the order on an annual basis. They've agreed to do that, have not challenged it. And that's not part of some other rule, counsel? No, no, it is not. That arose in the case saying, give us a compliance filing to show us you're complying with MAOP progress, that you've hit your 2028 target. Are you on track to clear 2035? That was the MAOP issue. Just want to be mindful of my time. So with respect to the long-term planning, neither NICOR nor the Ameren decision can draw a meaningful line between the long-term gas infrastructure directive at page 231 and those other compliance filings. Under their theory, if we're telling them, give us information, and that means give us information a year after our final orders already come out, we need to issue an APA rulemaking. It is very unusual, I'll say. I don't think it's quite every case, but it's very unusual in a rate case for there not to be follow-up compliance issues. It's an incredibly complex proceeding. People make mistakes, and we want to know that all the information is there in case we need to reopen the document and amend the order. So those types of compliance filings are typical. This is simply another one of them. And I'll just note just this last point on long-term gas. NICOR, out of the fact that these were all issued on the same day, something the court may not know, these four utilities, I believe NICOR filed January 3rd, 2023. Ameren and North Shore Peoples filed January 6th. They all filed within a week of one another. By statute, under 9201B, we have to conclude them within 11 months. We have to finish them because they're suspending the tariffs, and we need to put in new tariffs for the next year. The commission only sits in a meeting. They only meet for these types of sessions, I think, two or three times a month. So it is not unusual that we would issue this requirement to multiple utilities on the same day. That is not indicative of a general policy. That is a function of these four utilities came in for a rate increase in the same week. And the commission had to conclude them, and that's why they issued them all on November 16th. Unless the court has any questions on long-term gas infrastructure, I'll turn to briefly some of the points raised by counsel. For starters, in the capital structure issue, NICOR does not challenge the ROE issue. The reduction from 9.81 to 9.5 was not taken up on appeal. If they wanted to challenge that, they could have. They didn't. The capital structure that was imputed, a 50% equity, 50% debt, there's substantial evidence in the record to show that that would – I believe it was Ms. Sheenakai Garlish's testimony at E6828. I believe it was her direct testimony or thereabouts, as we cited in our brief. That a 50% debt-to-equity ratio would not result in a credit downgrading. And, in fact, part of what prompted a reduction was NICOR's parent company itself faced a downgrade in between the two rate cases. That was part of the prompting of closely examining what this utility is doing inflating its equity portion. Because it seems like its parent company is taking on excess debt, triggering a downgrade, and possibly foisting those costs onto Illinois rate payers. And that's a violation of 9.230. I just want to point out with respect to – I see my time is running. With respect to the MAOP directive in the Ameren decision, the court there committed error in finding that the F-4 filing – Section 285.610 – that is an initial filing to check a box. List your 10 most expensive projects and give us this information. Section 285.110 explicitly states that that is not evidence. I see my time is up. Could I finish my thought on that? Actually, counsel, I'd like you to finish your thought on that because that was going to be my question. Part 285.110 stipulates that the 285 filings, the portion filed under this section, is not evidence unless moved into the record. That's, I believe, subparagraph B. Subparagraph A further says that the commission is not bound by that filing in the things that it inquires into. And third, the 285 filing is not evidence of prudence. It has nothing to do with prudence. It is used for staff and other interveners. And this is in Part 285.110. It is used for staff to develop testimony and examine this rate filing. So the Ameren court committed reversible error by treating F-4 as evidence and then reweighing the evidence, misapplying the standards. And we ask the court not to not to follow that Ameren decision because of it. Unless there are any other questions, I'll conclude there. Just one. In this case, was it moved into the record? It was moved into the record. However, there was debating testimony on both sides about the efficacy of those MAOP costs, in particular the total 57.7 million, considering that that number spiked from 9.2 million in 2023, 600 percent to 57 million. The question arose, what was spiking that? And it was an overuse of pipe replacement, the most expensive of the six approved PHMSA methods for reconfirmation. Thank you, counsel. Justices, any other questions? No, thank you. All right. Mr. Brillo. So just to begin, let's start where we ended there, which was regarding the F-4, because as counsel conceded, it was moved into evidence. So this idea that you can't rely on it and that the commission can't look at it is just simply false in this case because it's in the record. The second point is that look at what the commission's actual finding on MAOP is. It's not that we think there is competing evidence and we find this to be unreasonable. What it said was that there is no evidence at all in the record. And that, as the Fifth District said, is just simply false. It's not true. And that means it's a decision that's not supported by substantial evidence. At the end of the day, though, again, counsel never addressed the legal component of the Fifth District's ruling on MAOP. You'll note he skirted completely by this retroactive application problem, which the commission was called disingenuous for. I might call it arbitrary and capricious. I think there are a lot of words you can use for retroactively applying a new rule or a new standard. But whatever it is, it's unlawful and you can't do it. So I would urge the court not to create a split of authority that can only be reconciled by the Illinois Supreme Court on this question. We are on all fours with Ameren, and there's simply no compelling reason to split from one of your sister districts. I would say the same thing is true about the long-term infrastructure plan point. And what I'll note is that my colleague here briefly, briefly addresses the critical issue here, which is whether or not this is a rule within the meaning of the Illinois Administrative Procedure Act. For if it is, then this rule fails because there was no notice and comment rulemaking. All my colleague said is actually the one thing that he didn't that they didn't say in their response brief, which is that this is not a statement of general application. And Justice Heddle, I think you rightly asked the question, well, how can that be if you're imposing the exact same standard, exact same virtually word for word rule on multiple parties on the same day? That's just a little bit, for lack of a better term, cute for an agency to say, oh, it's not a rule. We'll put it in individual adjudications that are all substantively similar. Now, counsel's response was, well, we didn't do it in every gas case. But Justice Heddle, you make the point, and I think it's right. Well, if you only do it as to some but not others, you've created a different problem and it's under a different clause of the Constitution. So at the end of the day, there's, again, no compelling reason to jettison the Fifth District's ruling on this issue. We think it's persuasive. We think it's correct. And it's completely consistent with what we said. And again, a split of authority on the issue of whether or not the commission can create perspective requirements of this sort. It just doesn't seem to be warranted. I do want to briefly take issue with the statement. Well, you didn't object to these other examples. Therefore, you can't object to this one. Of course we can. And part of the problem here is that this one has a unique component, which is so, which is that it is so flagrantly beyond the commission's statutory authority. As the Fifth District really highlight, it took an act of the General Assembly to create the authority to make this requirement on a prospective basis as to electric. It would beggar belief that that was just simply a hollow, unnecessary act that the General Assembly just wasted its time going over and including that in the siege of legislation. If it turns out that authority existed all the time and the commission never acknowledges that that is the fundamental issue that the Fifth District found so troubling here, which is this idea of a General Assembly that just simply wastes its time. Coming back then to the capital structure issue. The this idea here, the council says there's been there's been a Southern has had a downgrade and that's evidence of inflation. Well, there's been no increase in the capital structure since Southern's since Southern's downgrade happened. So the idea that there is this causal relationship, which is the critical thing that has to be shown here is just wrong. I'll also point out that the witnesses 12 page analysis that that council insists is not cursory. It may not be cursory, but it is general. She analyzes the industry as a whole and then identifies this incentive. But she never says, and here's how I know this is going on here. And she can't because the capital structure has been constant both before and after the merger. That evidence doesn't exist. And that's why that finding is not supported by substantial evidence. The last point I want to add here is this council never takes on what we think is the critical point here, Justice Heddle. And it is the one that I flagged at the beginning, which is they're articulating a standard no more than necessary equals unreasonable or imprudent. We have said, and I think we've shown that that is a misstatement of the law. And the court has an obligation to discipline the commission on correctly, dispassionately, fairly applying what the law requires. Unless there are any further questions, we would. Thank you, Mr. Berlo. I'm going to try to put this in as plainly terms as I can. Doesn't the commission have the ability and the obligation, if they think it's appropriate, to slow down a project? They're arguing that, all right, that fits within the guidelines that the feds have set forth, but you're just going too fast. You're doing this for maybe ulterior motives because gas is transforming into other sources of energy. And isn't that their function? Why is it unfair to you for them to reach that conclusion? So, Justice Heddle, I assume you're referring to the MAOP part of the analysis. Yes, yes. OK, I just want to be absolutely clear about that. So my answer to that question is as follows. It's twofold. The first here is that the Fifth District also dealt with this issue. This was also a finding in Ameren. And what the Fifth District said is that this finding that you may be front-loading, and that's what they say, they say maybe, is not a sufficient basis to sustain the MAOP ruling in the face of the retroactive application of a new standard. It's not a sufficient basis to sustain it when the substantial evidence doesn't support the finding that there was no evidence put in the record when, in fact, the evidence was there. So I would start with that being correct. It may be on remand that that finding could be made, and it may be that if we come back before your honor, you would ask me the same question. But as it stands right now, this ruling simply has too many problems to be sustained solely on that. The more fundamental answer to your question, though, is that the evidence of front-loading here is paper-thin. What the evidence shows is that we are ahead of pace to have, if you were to spread this out evenly over the course to 2035. But the point that I would make is that the federal mandate is not to use every single day possible in this process. The federal statutory mandate is to complete this work because of its importance as expeditiously as is economically possible. So to the extent the commission is imposing a different standard that conflicts with federal law, I think we all know who wins in that debate. So, yes, I think they are perfectly within their right to say that we would like to have you slow down in most circumstances and do things at a pace that is reasonable, that is balancing the safety needs, which is what we talked about when we were here on QIP with the economic impact on ratepayers. But in the face of a federal mandate, I would strongly suggest that it goes too far for the commission to say, you must slow down when the federal statute says you must go essentially as quickly as you realistically can. If that's what it says, but I'll leave it at that. To my colleagues, any other questions? No, thank you. I do not. Gentlemen, thank you very much for it almost seems like we should have given you both more time on this very complex matter, but it's appreciated. Have a good day. And the clerk is going to escort you out of our our Zoom room and we will issue an opinion here or excuse me, a ruling in due course.